**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

LANITA DELAE,                              )        CASE NO. 1:13-CV-01408
                                           )
                    Plaintiff,             )        JUDGE GAUGHAN
                                           )
         v.                                )        MAGISTRATE JUDGE
                                           )        VECCHIARELLI
CAROLYN W. COLVIN,                         )
         Acting Commissioner               )
         of Social Security,               )
                                           )        **REPORT AND RECOMMENDATION**
                    Defendant.             )

         Plaintiff, Lanita Delae ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(I), 423, 1381 *et seq.* ("Act").  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation.  For the reasons set forth below, the

Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

         On April 6, 2011, Plaintiff filed applications for POD, DIB, and SSI, alleging a

disability onset date of March 2, 2011.  (Transcript ("Tr.") 11.)  The applications were

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id.*)  On June 28, 2012, an ALJ held a hearing.  (*Id.*)

Plaintiff appeared at the hearing and testified.[1]  (*Id.*)  A vocational expert ("VE") also

participated and testified.  (*Id.*)  On July 17, 2012, the ALJ found Plaintiff not disabled.

(Tr. 8.)  On May 6, 2013, the Appeals Council declined to review the ALJ's decision,

and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On June 27,

2013, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc.

No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13,14.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in failing to

discuss any of the medical records from treating psychologist Robert Carson, Ph.D.,

LISW; and (2) the ALJ erred in finding that Plaintiff's impairment did not meet and/or

equal Listing 12.04 and/or 12.08.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in November 1965 and was 45-years-old on the alleged

disability onset date.  (Tr. 18.)  She had a limited education and was able to

communicate in English.  (*Id.*)  She had past relevant work as a nightclub dancer.  (*Id.*)

### B.  Medical Evidence

#### 1.  Physical Limitations

##### a.  Medical Reports

On November 9, 2010, Plaintiff presented to the breast clinic of the MetroHealth

System reporting a mass on her left breast.  (Tr. 314.)  An ultrasound of Plaintiff's left

breast revealed a solid mass.  (Tr. 328.)

---

[1]     Although informed of the right to representation, Plaintiff chose to appear
and testify without the assistance of an attorney.  (Tr. 11.)

On March 31, 2011, Plaintiff presented to the emergency room with complaints of a single episode of fainting.  (Tr. 343.)  She reported feeling light-headed and nauseous and complained of weakness, dizziness, and some left facial numbness.  (*Id.*)  Plaintiff was diagnosed with epilepsy, hypokalemia, orthostatic hypotension, nausea with vomiting, tobacco use disorder, cannabis abuse, cardiac dysrhythmia, and chest pain.  (Tr. 344.)  An MRI of Plainitff's brain was unremarkable.  (Tr. 379.)

On April 1, 2011, Sheila Rubin, M.D., saw Plaintiff for a consultation regarding syncope and seizure.  (Tr. 347.)  Plaintiff reported a remote history of head injury with a single seizure, recent menorrhagia, and recent left breast biopsy.  (*Id.*)  She told Dr. Rubin that she had been experiencing fatigue, episodic nausea, abdominal pain, diarrhea, and dizziness for the past few weeks.  (*Id.*)  Plaintiff admitted to using marijuana but denied the use of other illicit drugs.  (Tr. 348-349.)  A motor examination revealed normal tone, bulk, and strength in the upper and lower extremities.  (Tr. 350.)  Dr. Rubin noted that Plaintiff's neurological examination was normal and that her brain MRI showed no cortical lesions that would be potentially causative of seizures.  (Tr. 351.)

On April 6, 2011, Plaintiff saw Dr. Tamara Winfield, D.O.  (Tr. 455.)  A neurological examination revealed that Plaintiff was alert and that her intellect was grossly normal.  (Tr. 456.)  Plaintiff's memory was intact; she had no motor weakness; her balance, gait, and coordination were intact; and she was oriented to time, place, person, and situation.  (*Id.*)

On April 20, 2011, Natalie E. Joseph, M.D., performed a left breast lumpectomy.  (Tr. 300.)  Plaintiff tolerated the procedure well and was discharged home later that

3

day.  (Tr. 297, 301.)

On July 1, 2011, Marc D. Winkelman, M.D., a neurologist, saw Plaintiff for complaints of seizures.  (Tr. 259-262.)  Plaintiff told Dr. Winkelman that she had passed out for two hours at work on April 11, and that a seizure had been observed at Euclid Hospital.  (Tr. 259.)  She stated that she had experienced one seizure when she was in her twenties.  (Tr. 260.)  A neurologic examination revealed that Plaintiff was alert and orientated to person, place, and time.  (Tr. 261.)  Her motor tone, bulk, and power were "ok" and she had no involuntary movements.  (*Id.*)  Dr. Winkelman's impression included history of one convulsion at age 25, history of seizures in spring 2011 (unclear if epilepsy or pseudoseizures), and history of "brain tumor" discovered when seizures began in 2011.  (Tr. 262.)  Dr. Winkelman reviewed a March 2011 MRI, which revealed a 6 millimeter enhancing mass over the right frontal convexity.  (*Id.*)

On August 8, 2011, Riem Hawi, M.D., a cardiologist, saw Plaintiff for intermittent chest pain.  (Tr. 252.)  Dr. Hawi noted that Plaintiff had a history of a seizure episode in April 2011 that had not recurred after she was started on Dilantin.  (*Id.*)  Diagnostic impressions included atypical chest pain, not related to exertion.  (Tr. 254.)  Dr. Hawi noted that Plaintiff did a fair amount of physical activity and that her chest pain or syncopal events had never occurred during power walking or other fitness activities, making coronary disease less likely.  (*Id.*)  Dr. Hawi recommended an echocardiogram, which was normal.  (Tr. 254, 319.)

On August 18, 2011, Dr. Winkelman, Plaintiff's neurologist, opined that Plaintiff had no limitations with respect to pushing/pulling, bending, reaching, handling, repetitive foot movements, seeing, hearing, and speaking.  (Tr. 472.)  Dr. Winkelman

4

concluded, however, that Plaintiff would not be allowed to drive, work at heights, or work around dangerous machinery.  (*Id.*)

On August 29, 2011, Plaintiff presented to the emergency room after her family stated they had witnessed a seizure.  (Tr. 237.)  A neurologic examination revealed that Plaintiff's orientation, speech, strength, sensation, and gait were all normal.  (Tr. 239.)  Plaintiff was medicated with a Dilantin extended release capsule and discharged in stable condition.  (Tr. 240-241.)

### b.    Agency Reports

On May 23, 2011, Diane Manos, M.D., a state agency medical consultant, rendered a physical residual functional capacity ("RFC") assessment based on a review of Plaintiff's record.  (Tr. 70-72, 83-85.)  Dr. Manos found that Plaintiff had no exertional limitations but had the following non-exertional limitations: Plaintiff could never climb ladders, ropes, or scaffolds and must avoid all exposure to hazards such as machinery and heights due to seizure activity.  (Tr. 70-71, 83-84.)  Dr. Manos noted that Plaintiff had not experienced any seizures after she was started on seizure medication, and that she had no history of seizures other than one seizure 15 years ago.  (Tr. 71, 84.)

On November 8, 2011, state agency medical consultant Elaine M. Lewis, M.D., rendered a physical RFC assessment based upon a review of Plaintiff's record.  (Tr. 102-104, 119-121.)  Dr. Lewis reached the same conclusions regarding Plaintiff's physical RFC as Dr. Manos.  (Tr. 70-72, 83-85, 102-104, 119-121.)

### 2.    Mental Limitations

#### a.    Medical Reports

On May 19, 2011, Plaintiff saw Richard C. Halas, M.A., a clinical psychologist. (Tr. 465.)  Plaintiff was referred to Mr. Halas by the Division of Disability Determination for an individual psychological evaluation.  (*Id.*)  Mr. Halas noted that Plaintiff was applying for disability benefits alleging physical problems and seizures that keep her from working competitively.  (*Id.*)  Plaintiff reported that she had an extensive psychiatric history, had been at a psychiatric hospital in the past, and had been admitted as an inpatient for depression two years ago.  (Tr. 466.)  Her behavior was flat; she was tearful; she was neither impulsive nor compulsive; her speech pattern was slow, constricted, and hesitant; she did not have any problems with fragmentation of thought or flight of ideas; the quality of her associations was simple and generally adequate at night and was fatigued during the daytime; she denied any thoughts of hurting herself; and she endorsed feelings of hopelessness and worthlessness.  (Tr. 466-467.)  During the evaluation, Plaintiff showed a high level of anxiety and her hand trembled.  (Tr. 467.)  Mr. Halas noted that Plaintiff seemed tense, anxious, and apprehensive, but not specifically phobic.  (*Id.*)  With respect to her mental content, her overall presentation was within normal limits, and she did not have any specific symptoms or characteristics consistent with a thought disorder or psychotic process. (*Id.*)  With respect to daily activities, Plaintiff reported that she watched television, went on walks for fun, had a valid driver's license, and did all of her cooking, cleaning, shopping, and laundry.  (Tr. 468.)  She reported that she had few friends.  (*Id.*)

6

Mr. Halas concluded that Plaintiff appeared to have little or no difficulty sitting, standing, walking lifting, carrying, or handling objects and that her capacity for traveling was intact.  (*Id.*)  Mr. Halas' diagnostic impression included anxiety disorder, not otherwise specified; depressive disorder, not otherwise specified; cannabis abuse; and borderline personality disorder with antisocial features.  (*Id.*)  Plaintiff had a Global Assessment of Functioning (GAF) score of 45, indicating serious symptoms.[2]  (*Id.*)

Mr. Halas concluded that Plaintiff had mild problems with respect to her ability to understand, remember, and carry out instructions; significant deficits with respect to her ability to maintain attention and concentration and maintain persistence and pace to perform simple and multi-step tasks; significant problems with respect to her ability to respond appropriately to supervision and to co-workers in a work setting; and significant deficits with respect to her ability to respond appropriately to work pressures in a work setting.  (Tr. 469.)  Mr. Halas opined that if granted benefits, Plaintiff would be unable to manage funds in an appropriate, practical, and realistic manner.  (*Id.*)  He noted: "The claimant has a history of marijuana use and continues to self-medicate rather than follow through with appropriate mental health interventions."  (*Id.*)

On July 11, 2011, Plaintiff saw Dr. Winfield for follow-up care.  (Tr. 511-513.)  Plaintiff stated that she began feeling depressed two months ago and found it somewhat difficult to meet home, work, or social obligations.  (Tr. 511.)  She claimed

---

[2]     The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

7

that she was experiencing anxious and fearful thoughts, irritable mood, diminished interest or pleasure, and fatigue or loss of energy.  (*Id.*)  On evaluation, Plaintiff was oriented to time, place, person, and situation, her affect was normal, and she was not anxious.  (Tr. 512.)  Dr. Winfield referred Plaintiff for a psychology consultation.  (Tr. 513-514.)

On July 27, 2011, Robert J. Carson, Ph.D., LISW, saw Plaintiff for depression, at which time Plaintiff stated that her symptoms had begun two years ago without significant break.  (Tr. 516.)  Her behavior was described as "limp;" her mood was depressed; her affect was constricted; her memory was intact; her intellect was average; her attention was gained and maintained; her impulse control was good; and her judgment, insight, and reasoning were fair.  (Tr. 517.)  Dr. Carson's clinical assessment included posttraumatic stress disorder and major depressive affective disorder.  (Tr. 518.)

On July 28, 2011, Dr. Winfield saw Plaintiff for follow-up care.  (Tr. 521.)  A psychiatric evaluation revealed that Plaintiff was oriented to time, place, person, and situation; her affect was normal; and she was not anxious.  (*Id.*)  On August 17, 2011, Dr. Carson noted that there was no change in Plaintiff's mental status.  (Tr. 524.)  On August 30, 2011, Plaintiff saw Dr. Carson for follow-up care, at which time she reported feeling anxious about her future and financial situation.  (Tr. 527.)  She noted that there were many things she wanted to do in her life such as getting her GED, singing the National Anthem at a sporting event, and teaching dance.  (*Id.*)

> **b.**  **Agency Reports**

8

On May 29, 2011, state agency psychological consultant Roseann Umana, Ph.D., completed a Psychiatric Review Technique form.  (Tr. 68-69, 81-82.)  Dr. Umana found that Plaintiff had affective, anxiety-related, personality, and substance addiction disorders that did not manifest at listing level severity.[3]

Dr. Umana also performed a mental RFC assessment based upon her review of the record.  (Tr. 72-73, 85-87.)  Dr. Umana found that Plaintiff had no understanding and memory limitations.  (Tr. 72.)  With respect to Plaintiff's ability to sustain concentration or persistence, Dr. Umana found that Plaintiff had no significant limitations in her ability to carry out very short and simple instructions and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; no evidence of limitation in her ability to carry out detailed instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions; and moderate limitations in her ability to maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 72, 85.)  Dr. Umana noted that Plaintiff would be able to understand, remember, and carry out simple instructions and some instructions that were more complex, and that her

---

[3]     Dr. Umana found that Plaintiffs disorders resulted in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation.  (Tr. 68.)

concentration was adequate for routine, repetitive tasks.  (Tr. 72, 86.)  With respect to

social functioning, Dr. Umana found that Plaintiff had no significant limitations in her

ability to ask simple questions, request assistance, or maintain socially appropriate

behavior and adhere to basic standards of neatness and cleanliness; and moderate

limitations in her ability to interact appropriately with the general public, accept

instructions and respond appropriately to criticism from supervisors, and get along with

coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 73,

86.)  Dr. Umana concluded that although Plaintiff's social functioning was limited, it was

adequate for superficial and occasional interactions.  (Tr. 73, 86.)  With respect to

adaptation, Dr. Umana found that Plaintiff had no evidence of limitation in her ability to

be aware of normal hazards and take appropriate precautions; no significant limitations

in her ability to set realistic goals or make plans independently of others; and moderate

limitations in her ability to respond appropriately to changes in the work setting, travel in

unfamiliar places, or use public transportation.  (*Id.*)  Dr. Umana concluded that Plaintiff

could adapt to work settings in which duties were routine and predictable, and that she

remained capable of work in a routine environment without frequent changes in

assigned tasks.  (*Id.*)

On September 20, 2011, Mel Zwissler, Ph.D., a state agency psychological

consultant, completed a Psychiatric Review Technique form and concluded that

Plaintiff's disorders did not meet the listings for mental impairments.  (Tr. 100-101, 117-

118.)  Dr. Zwissler also performed a mental RFC assessment based upon his review of

Plaintiff's record and reached the same conclusions regarding Plaintiff's mental RFC as

Dr. Umana.  (Tr. 72-73, 85-87, 104-106, 121-123.)

10

**C.      Hearing Testimony**

      **1.      Plaintiff's Hearing Testimony**

Plaintiff last worked as a female entertainer in lounges and bars.  (Tr. 32.)  She testified that she became unable to work on March 2, 2011, because she had been passing out and not knowing why, and she had begun experiencing mood swings.  (*Id.*) "I lost four jobs in one month and they all pertained to my mood swings and my attitude."  (*Id.*)  Plaintiff stated that she became unable to think, walk, talk, or hold a pen and that she began forgetting things and becoming disoriented.  (Tr. 33.)  Plaintiff testified that she was on Dilantin and had not experienced any seizures since she began taking that medication.  (Tr. 36-37.)

Plaintiff testified that she could lift 25 to 30 pounds and sit for 15-20 minutes at a time.  (Tr. 38.)  She had problems with her nerves and her memory.  (Tr. 39.)  Plaintiff stated that she could shower, wash her hair, and get dressed by herself but it took her longer than it used to.  (Tr. 41.)  Plaintiff had a driver's license and drove herself to her hearing.  (Tr. 31.)  Describing a typical day, Plaintiff testified that she watched the news on television and went power-walking in the morning five days a week, which involved walking up a hill for six miles.  (Tr. 42.)  She often called family and friends and went window-shopping, to the beach, and to church every Sunday.  (Tr. 43.)  She stated that she had problems dealing with crowds, preferred getting together with her family and

people she knew, and kept to herself when she was working at various clubs.  (Tr. 39-40.)

### 2.    Vocational Expert's Hearing Testimony

Gene Burkhammer, a licensed clinical counselor and vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual who was 46-years-old, had a nine-year education, and could read and write at a rudimentary level.  (Tr. 58.)  The individual had no exertional limitations but had the following non-exertional limitations: She could not climb ladders, ropes, or scaffolds; she could not be exposed to hazards such as heights, machinery, or commercial driving; and she must be limited to performing simple to moderately complex tasks of a routine, repetitive nature involving superficial and occasional interactions.  (Tr. 48.)  The VE testified that the hypothetical individual could not perform Plaintiff's past work as a nightclub dancer, but could perform other jobs existing in significant numbers in the national and regional economies.  (Tr. 48-49.)  These jobs include a hand packager, a housekeeping cleaner, an order puller, and a mail clerk (outside the post office).  (Tr. 49.)

The ALJ asked the VE to assume a second hypothetical individual with the same age, education, work background, and residual functional capacity as provided previously but with the additional limitation that due to symptoms from medically determinable impairments, the individual would be off task at least 20 percent of the time.  (*Id.*)  The VE testified that there no jobs existing in significant numbers in the economy that the individual could perform.  (Tr. 50.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her

13

past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.    The claimant has not engaged in substantial gainful activity since March 2, 2011, the alleged onset date.

3.    The claimant has the following severe impairments: seizure disorder due to brain meningioma; depressive disorder; anxiety disorder; borderline personality disorder; history of cannabis abuse.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant must avoid all exposure to workplace hazards, including dangerous machinery and commercial driving; she can never climb ladders, ropes, or scaffolds; and she can perform simple to moderately complex tasks of a routine, repetitive nature, and involving superficial and occasional interactions.

6.    The claimant is unable to perform any past relevant work.

7.    The claimant was born on November 23, 1965, and was 45-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

14

8.      The claimant has a limited education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Act, from March 2, 2011, through the date of this decision.

(Tr. 13-20.)

## LAW & ANALYSIS

### A.      Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported

15

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

>    **B.**    **Plaintiff's Assignments of Error**

> ### 1. The ALJ Erred in Failing to Discuss Any of the Medical Records from Treating Psychologist Robert Carson, Ph.D., LISW.

Plaintiff argues that the ALJ erred by "failing to even reference or discuss" any of the records from treating psychologist Robert Carson, Ph.D., LISW.  (Plaintiff's Brief ("Pl.'s Br.") at 12.)  According to Plaintiff, the ALJ violated the treating physician rule by not acknowledging the counseling records of Dr. Carson and, as a result, failing to explain what weight, if any, he gave to Dr. Carson's opinion regarding Plaintiff's mental limitations.  The Commissioner responds that the ALJ properly acknowledged Dr. Carson's progress notes.[4]  For the following reasons, Plaintiff's argument is not well taken.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic

---

[4]    The Commissioner also raised the argument that the ALJ was not required to give controlling weight to Dr. Carson because he only saw Plaintiff on three occasions and never provided an RFC assessment of Plaintiff's mental condition.  (Defendant's Brief ("Def.'s Br.") 14.)  The Court will not address this argument, however, given that the ALJ made the factual finding that Dr. Carson was a "treating mental health source." (Tr. 18.)

techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id*.

Here, the Commissioner is correct in noting that the ALJ did not fail to address Dr. Carson's records altogether, as Plaintiff contends.  In his decision, the ALJ referred to the opinion of a "treating mental health source" who assigned Plaintiff a GAF of 50.  (Tr. 18.)  This is a reference to Dr. Carson, whose progress notes are found at Exhibit 7F.  (*Id.*)  The ALJ noted:

> While the treating mental health source also assigned a GAF of 50 in the "serious" range of functional impairment (Exhibit 7F), the undersigned finds that the weight of the evidence supports no more than moderate functional limitations stemming from her mental impairments as she left her past work primarily due to her seizure condition.  While the claimant may have some difficulties tolerating stress and interacting with others due to stress and anxiety, the evidence fails to support that her impairments limit her capacity for basic mental activity.

17

(*Id.*)  Thus, while the ALJ did not refer to Dr. Carson by name, it is clear that he at least considered Dr. Carson's records.

Furthermore, Plaintiff argues that the ALJ erred by failing to explain what weight, if any, he gave to the opinion of Dr. Carson.  Plaintiff's argument is without merit, as Dr. Carson never rendered any opinions regarding Plaintiff's mental limitations.  While Dr. Carson diagnosed Plaintiff with posttraumatic stress disorder and major depressive disorder, it is well established that the "mere diagnosis" of a condition "says nothing" about its severity, or its effect on a claimant's ability to perform work. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  Plaintiff has not addressed any records from Dr. Carson indicating not only that Plaintiff has diagnosed mental impairments, but also that she has associated functional limitations that could render her disabled.  Thus, the ALJ did not err in his assessment of Dr. Carson's treatment notes; the fact that Dr. Carson's treatment notes include diagnoses that support Plaintiff's allegations of functional limitations stemming from her mental impairments does not, alone, require the ALJ to include limitations specifically related to those diagnoses in Plaintiff's RFC.  Accordingly, Plaintiff has provided an inadequate basis to conclude that the ALJ erred by failing to throughly discuss the medical records of one of Plaintiff's treating physicians.

Moreover, Plaintiff notes that Dr. Carson's records are consistent with those of consultative psychological examiner Richard Halas, M.A.[5]  The ALJ, however, gave Mr.

---

[5]     Mr. Halas concluded that Plaintiff had significant deficits in her ability to maintain attention, concentration, persistence, and pace for both simple and multi-step tasks; and that Plaintiff would have significant problems in social functioning, particularly with co-workers and supervisors.  (Tr. 469.)

18

Halas' opinion only "some weight," finding that it was inconsistent with the evidence as

a whole and appeared to be based heavily on Plaintiff's subjective complaints.  (Tr. 18.)

For example:

- • The ALJ explained that the objective medical evidence and treatment records failed to support the existence of a totally disabling mental condition.  (Tr. 17)

- • The ALJ noted that Plaintiff reported to Mr. Halas that she had a history of inpatient hospitalization, but that there had been no such episodes during the relevant period.  (Tr. 17.)

- • The ALJ explained that until her seizure activity began in March 2011, Plaintiff was able to work, despite her later allegations of depression and anxiety for the past several decades.  (Tr. 18.)

- • The ALJ considered the fact that Plaintiff did not seek treatment for depression until July 2011, and was not on any type of antidepressant medication prior to that time.  (Tr. 18.)

Notably, Plaintiff does not challenge the ALJ's assessment of Mr. Halas' opinion; she

argues only that because Dr. Carson's records are congruent with Mr. Halas', the ALJ

erred in failing to properly account for Dr. Carson's findings.  Plaintiff has failed to

explain how the similarity between Dr. Carson and Mr. Halas' findings have any impact

on the outcome of her case, particularly when the ALJ explained that Mr. Halas' findings

were inconsistent with the evidence as a whole and therefore entitled to only some

weight.  Accordingly and for the foregoing reasons, Plaintiff's first assignment of error

does not present a basis for remand.

## 2.  The ALJ Erred in Finding That Plaintiff's Impairment Did Not Meet and/or Equal Listing 12.04 and/or 12.08.

There is no merit to Plaintiff's argument that the ALJ erred in failing to find that

Plaintiff's impairment meets or equals Listing 12.04[6] and/or 12.08.[7]  At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or medically equals one of the impairments in the Listings.  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)).  An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment.  *Id.* at 415; *Hunter v. Astrue*, No. 1:09-cv-2790, 2011 WL 6440762, at *3 (N.D. Ohio Dec. 20, 2011); *May v. Astrue*, No. 4:10-cv-1533, 2011 WL 3490186, at *8-9 (N.D. Ohio June 1, 2011).  Nevertheless, it is the claimant's burden to show that she meets or medically equals[8] an impairment in the Listings.  *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987) (per curiam).

Here, the ALJ engaged in a detailed discussion of why the severity of Plaintiff's

---

[6]    Listing 12.04 is the listing for affective disorders.  *See* 20 C.F.R. Pt. 404, Subpt. 404, App. 1, 12.04.

[7]    Listing 12.08 is the listing for personality disorders.  *See* 20 C.F.R. Pt. 404, Subpt. 404, App. 1, 12.08.

[8]    A claimant may be found disabled if her impairment is the *medical equivalent* of a listing.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). This means that the impairment is "at least equal in severity and duration to the criteria of any listed impairment."  20 CFR § 416.926(a); 20 CFR § 404.1526(a).  An ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any listed impairment.  *Cf. Lawson v. Comm'r of Soc. Sec.*, 192 Fed.Appx. 521, 529 (6th Cir. 2006) (upholding ALJ who "compar[ed] the medical evidence of Lawson's impairments with the requirements for listed impairments contained in the SSA regulations").

20

mental impairments, considered singly and in combination, do not meet or equal the criteria of listings 12.04, 12.06, 12.08, and 12.09. (Tr. 14-16.) For example, the ALJ explained:

- In activities of daily living, Plaintiff has mild restriction. (Tr. 14.) She lives alone in an apartment and is able to perform all household chores, prepare her meals, and care for herself. (*Id.*) "The DDS psychological consultant concluded that the claimant had mild limitations in this functional area, and the undersigned adopts that opinion, as it is consistent with this evidence of a relatively wide range of functioning." (*Id.*)

- In social functioning, Plaintiff has moderate difficulties. (Tr. 14.) Despite her limitations, Plaintiff stayed in regular contact with family members, had a boyfriend, attended church, and performed volunteer work at a local food bank. (Tr. 15.) She was able to interact appropriately in public when she went grocery shopping and checked out books from the library. (*Id.*) "The DDS consultant opined that the claimant had moderate limitations in this area, and the undersigned adopts that opinion, as it is consistent with this evidence of significant retained social functioning." (*Id.*)

- Plaintiff has moderate difficulties with regard to concentration, persistence, or pace. (Tr. 15.) While she exhibited difficulty in memory and concentration at the consultative examination, the report noted that she appeared to be guessing and exaggerating at times. (*Id.*) Plaintiff can watch television, read books, and use a telephone. (*Id.*) "The undersigned finds this evidence more consistent with the DDS consultant's opinion that the claimant had moderate limitations in this area." (*Id.*)

- There is no indication in the record that Plaintiff has experienced any episodes of decompensation. (Tr. 15.)

Despite the ALJ's detailed discussion of Plaintiff's mental condition as summarized above, Plaintiff argues that substantial evidence does not support the ALJ's conclusion that Plaintiff does not meet Listing 12.04 and/or 12.08, because Mr. Halas noted that Plaintiff had significant deficits in her ability to maintain attention, concentration, persistence, and pace for both simple and multi-step tasks; and that

21

Plaintiff would have significant problems in social functioning, particularly with co-workers and supervisors.  (Pl.'s Br. 14.)  Plaintiff also notes that "[t]reating psychologist Dr. Robert Carson's records corroborate and also show that Ms. Delae would have marked inabilities in concentration, persistence and pace and social functioning," but fails to identify which records from Dr. Carson support this claim.  (Pl.'s Br. 15.)  Plaintiff may be correct that evidence from Mr. Halas and Dr. Carson support the conclusion that she meets or medically equals Listings 12.04 and/or 12.08.  But this is not the appropriate standard to apply to the ALJ's decision.  An ALJ's decision that is supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.  Moreover, as discussed previously in this Court's discussion of Plaintiff's first assignment of error, the ALJ adequately explained why he gave only some weight to Mr. Halas' opinion and less than controlling weight to Dr. Carson's opinion.   To the extent the ALJ did find that Plaintiff had mental limitations, he accommodated those in Plaintiff's RFC by limiting her to moderately complex tasks of a routine, repetitive nature, and involving superficial and occasional interactions.  (Tr. 16.)  The Court finds no basis to conclude that the ALJ's decision lacks the support of substantial evidence.  Accordingly, Plaintiff's second assignment of error does not present a basis for remand.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: April 4, 2014

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

23